# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 15, 2017

Lyle W. Cayce
Clerk

No. 17-20021

———————

VANCE ANDERSON, on behalf of himself and others similarly situated,

 Plaintiff - Appellant

v.

HEARTS WITH HOPE FOUNDATION,

 Defendant - Appellee

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CV-2037

———————

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

A class of former "Direct Care Personnel" employees (collectively "Anderson") at the Hearts With Hope Foundation ("HWHF") appeal the district court's order granting summary judgment in favor of HWHF. Anderson contends that the district court erred in concluding that HWHF was not an "enterprise" covered by the Fair Labor Standards Act ("FLSA"). For the

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20021

reasons set forth below, we AFFIRM the district court's grant of summary judgment in favor of HWHF.

I

HWHF is a non-profit organization operating two group homes, one for boys and one for girls, that provide residential care for children who have been the victims of abuse, abandonment, and neglect. Children are placed in HWHF's group homes through the Child Protective Services ("CPS"), a division of the Texas Department of Family and Protective Services ("DFPS"), as part of a residential child-care contract between HWHF and the state. The group homes provide 24-hour care to children between the ages of seven and seventeen and are licensed as "General Residential Operations." The boys' home is also licensed as a "Residential Treatment Center."

Before placing children at HWHF, CPS assigns each child a "service level" that corresponds to their behavioral profile and placement needs. HWHF provides care to children in four service level categories: basic, moderate, specialized, and intense. Upon receiving a referral packet from CPS, HWHF determines whether the child's placement in one of the group homes is appropriate. In making this determination, HWHF takes into consideration the child's background, behavior, and intellectual level, as well as the potential for the child's placement to disrupt the progress of any current residents. HWHF is not licensed to provide care to children with intensive psychiatric needs, and it does not accept particularly high-risk children such as those diagnosed as psychotic, schizophrenic, or prone to violent behavior.

Unsurprisingly, many of the children placed at one of the HWHF group homes require some kind of regular therapy and psychological evaluation. Although HWHF employees participate in an individualized treatment plan for their residents by helping to create a safe and watchful "homelike" environment, they are not licensed to diagnose any medical, psychological, or

psychiatric conditions, and they do not provide individualized or group therapy. Instead, the children are given access to third-party professionals—psychiatrists, psychologists, and licensed counselors—on an as-needed basis when they make periodic visits to the homes. Based in large part on the assessment of a child's individualized needs provided by these outside professionals, the staff at HWHF implements the treatment teams' suggestions for improving the child's behavioral health. The children at HWHF attend public schools off-site, and the employees at the group homes engage mostly in basic recreational therapy with the children such as listening to music, participating in extracurricular activities, and working on basic social and life skills.

In 2012, after attending a human resources training, a Manager at HWHF became concerned that HWHF may be covered by FLSA and that it was not currently in compliance with FLSA's overtime pay requirements. HWHF contacted the Department of Labor ("DOL") and was told that, based on an initial assessment of the information given over the phone, HWHF may be subject to FLSA. Based on this assessment, HWHF began paying overtime wages, including retroactive overtime wages for the preceding two or three years. Later that year, DOL conducted an on-site audit of HWHF and concluded that HWHF was probably not covered by FLSA. Nonwithstanding the results of the 2012 DOL audit, HWHF continued to pay its employees overtime wages in compliance with the statute. The DOL conducted a second audit in 2013—which included a visit to one of HWHF's group homes—and again told HWHF that it was not required to comply with FLSA's overtime pay requirements.[1] In March 2014, HWHF revised its overtime pay policy to

_____

[1] Specifically, the DOL auditor referred HWHF to a provision in the DOL Field Operations Handbook which provides:

No. 17-20021

provide overtime wages only for work in excess of 100 hours in an 80-hour pay period rather than any work in excess of 40 hours in a given week.

Anderson filed a collective action complaint against HWHF on behalf of himself and other similarly situated "Direct Care Personnel" employees, alleging that HWHF had violated FLSA by failing to pay overtime wages for hours worked in excess of 40 hours per week. The district court granted Anderson's request for conditional class certification. Following discovery, HWHF moved for summary judgment. The district court granted HWHF's motion, concluding Anderson had failed to demonstrate that HWHF is "an institution primarily engaged in the care of the . . . mentally ill or defective" under 29 U.S.C. §§ 203(r) and (s) for the purposes of establishing enterprise coverage under FLSA. Anderson timely appeals.

II

This court reviews the district court's grant of summary judgment de novo. *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There exists a genuine dispute of material fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, we view the evidence in

---

> Private nonprofit institutions providing care for neglected and dependent children are not covered by the enterprise provisions of the FLSA, provided that such institution is not operated in conjunction with a hospital, covered institution, or school within the meaning of sections 3(r) and 3(s) of the Act.

Dept. of Labor, Wage & Hour Div., Field Operations Handbook § 12g18 (March 31, 2016) (available at https://www.dol.gov/whd/FOH/FOH_Ch12.pdf).

4

No. 17-20021

the light most favorable to the nonmovant. *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).

## III

Anderson bears the burden of demonstrating that HWHF employees are entitled to FLSA protection. *See Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.*, 474 F.3d 828, 829 (5th Cir. 2007). To establish FLSA coverage, Anderson must show (1) he was personally engaged in commerce or the production of goods for commerce ("individual coverage") or (2) he was employed by an enterprise engaged in such activity ("enterprise coverage"). *See* 29 U.S.C. § 207(a)(1); *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992). Anderson claims that HWHF is subject to FLSA as an enterprise engaged in commerce.

The FLSA defines an "enterprise" as "the related activities performed . . . by any person or persons for a common business purpose." 29 U.S.C. § 203(r). Non-profit institutions such as HWHF are generally exempt from FLSA coverage except to the extent that they engage in commercial activity performed for a "business purpose." *See Tony and Susan Alamo Foundation v. Sec. of Labor*, 471 U.S. 290, 297 (1985). An activity is, however, considered to be performed for a business purpose when it is done "in connection with the operation of . . . an institution primarily engaged in the care of the sick, the aged, [or] the mentally ill or defective who reside on the premises of such institution," regardless of whether the institution is a for-profit or non-profit entity. 29 U.S.C. § 203(r)(2)(A).[2] Anderson contends that HWHF is covered by FLSA because it is primarily engaged in the care of sick or mentally ill residents.

---

[2] Similarly, an enterprise is "engaged in commerce or in the production of goods for commerce" if it is "engaged in the operation of . . . an institution primarily engaged in the care of the sick, the aged, or mentally ill or defective who reside on the premises of such an institution," regardless of the institution's non-profit status. 29 U.S.C. § 203(s)(1)(B).

No. 17-20021

In *Brennan v. Harrison County, Mississippi*, this court looked to "[t]he sole primary, essential, fundamental authority and purpose" of a home for the indigent in order to determine whether it was "primarily engaged" in the care of the mentally ill or infirm. 505 F.2d 901, 903–04 (5th Cir. 1975). In concluding that the home was not covered by FLSA, we stated that "[i]ndigency, not illness or age, was the indispensable prerequisite for the operation of the home. That the inmates were old or ill was an incidental, not a primary factor." *Id.* at 904. Other courts similarly look to the motivating purpose of an institution to determine whether it is "primarily engaged in" caring for the mentally ill. *See, e.g.*, *Murray v. R.E.A.C.H. of Jackson Cty., Inc.*, 908 F. Supp. 337, 340 (W.D.N.C. 1995) (holding that a residential facility for victims of sexual abuse and domestic violence was not covered by FLSA because "[t]he most important function of this facility is not to provide permanent housing for individuals who are there because they are mentally ill"); *Kitchings v. Florida United Methodist Children's Home, Inc.*, 393 F. Supp. 2d 1282, 1288 (M.D. Fla. 2005) (holding that a residential children's home was not a covered enterprise under FLSA even though "[m]ost of the Residents . . . do have some form of psychological disorder" in part because "[t]he primary reason for placement is that the child is unable to reside with their natural parents or guardians").

The record demonstrates that caring for the mentally ill or infirm was not the "primary, essential, fundamental authority and purpose" of the HWHF group homes. *Brennan*, 505 F.2d at 903–04.[3] As the district court aptly noted, "the 'primary, indispensable requirement' for admission to either of the HWHF homes is that the child [has] been abused and/or neglected and in need of a

---

[3] Notably, when Anderson was asked during his deposition whether he believed HWHF "treats the mentally ill," he replied "no." Instead, he agreed that HWHF was "primarily engaged in helping return abused and abandoned children to a home environment."

6

safe, residential environment." That the children often suffer from mental health or behavioral issues is "an incidental, not a primary factor" motivating their admission to HWHF. *Id*. at 904.[4] None of the employees at HWHF are licensed to provide professional counseling or to diagnose medical, psychological, or psychiatric conditions. All psychological and psychiatric services are outsourced to third-party professionals. HWHF does not accept children with intensive psychiatric needs, and it is not licensed to do so. The employees at HWHF are involved with the children's treatment teams insofar as they implement professional suggestions on a day to day basis and help provide a safe, therapeutic environment, but they are not medical professionals engaged to treat mental health issues. Anderson has failed to raise an issue of material fact with respect to whether HWHF was "primarily engaged in" the care of the mentally ill. Accordingly, the district court properly concluded that HWHF was not a covered enterprise under FLSA.[5]

## IV

We AFFIRM the judgment of the district court.

---

[4] Anderson relies considerably on the guidance provided in the DOL's Field Operations Handbook which states that an institution would be covered if more than fifty percent of its residents "have been admitted by a qualified physician, psychiatrist, or psychologist." Dept. of Labor, Wage & Hour Div., Field Operations Handbook § 12g12. The Handbook goes on to say, however, that "[f]or the purposes of the 50 percent test, the term 'admitted' includes evaluations of mental or emotional disturbance by a qualified [doctor] either subsequent to admission to the institution or preceding admission *and being the cause for referral*." *Id*. (emphasis added). Though more than fifty percent of the children admitted to HWHF group homes suffer from some sort of mental health or behavioral issues, they are not referred to HWHF *because* of these issues. Rather, children are placed at HWHF through CPS because they have been deprived of a safe home environment due to abuse, neglect, or abandonment and are in need of full-time residential care.

[5] Because we conclude that HWHF is not covered by FLSA, we need not address Anderson's contention that HWHF failed to establish that it acted in good faith when it attempted to ascertain whether it was subject to FLSA and subsequently declined to pay FLSA-compliant overtime wages.